```
GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gordonsilver.com
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
E-mail: tgray@gordonsilver.com
CANDACE C. CLARK, ESQ.
Nevada Bar No. 11539
E-mail: cclark@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
[Proposed] Attorneys for Ten Saints LLC
```

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| In re: | Case No.: 11-21028-MKN |
|---|---|
| TEN SAINTS LLC, | Chapter 11 |
| Debtor. | Date: OST Pending<br>Time: OST Pending |

### OMNIBUS DECLARATION OF TODD NIGRO IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS

I, Todd Nigro, hereby declare as follows:

1. I am over the age of 18 and am mentally competent and I make this declaration in support of Debtor's *Emergency Motion For Entry of an Interim Order Pursuant to Bankruptcy Rule 4001(b) and LR 4001(b): (1) Preliminarily Determining Extent of Cash Collateral and Authorizing Interim Use of Cash Collateral by Debtor; and (2) Scheduling a Final Hearing to Determine Extent of Cash Collateral And Authorizing Use of Cash Collateral by Debtor* (the "<u>Cash Collateral Motion</u>"), the *Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for an Order Determining that Adequate Assurance Has Been Provided to the Utility Companies* (the "<u>Utility Motion</u>"), and the *Emergency Application for Order Permitting Debtor to Honor Tenant Deposits* (the "<u>Deposits Motion</u>," and collectively, the "<u>Motions</u>").[1]

---

[1] All capitalized, undefined terms shall have the meaning ascribed to them in the applicable Motion.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102507-003/1263103

2.   Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents and information supplied to me by other members of Debtor's management and Debtor's business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would do so.

3.   Attached hereto as **Exhibit "1"** is a summary of projected income and expenses for the three-months following the Petition Date (the "Budget"), which concludes on September 30, 2011.

### A.   Debtor's Operations.

4.   Debtor is a Nevada limited liability company owned by: (i) Nigro Saints LLC; (ii) Hansen Saints LLC; (iii) New Saints LLC; (iv) John M & Elaine D DeNiro; (v) Andrew & Ruth Kryk; (vi) Nigro Development LLC; (vii) William Weatherford Sr.; (viii) William Weatherford Jr.; (ix) Troy & Julie Nelson Living Trust; and (x) Dennis Nelson Living Trust U/A/D 2003; and is managed by Nigro Saints LLC.

5.   Debtor owns and operates the Hampton Inn & Suites (the "Hampton Inn") located on the southwest corner of St. Rose Parkway and Seven Hills Drive in the city of Henderson, Nevada, APN 177-35-513-006 (the "Property").

6.   The 134-room Hampton Inn was built in 2007 and features a breakfast-room with complimentary breakfast service, approximately 2,750 sq. ft. of meeting space, an outdoor swimming pool, a whirlpool, a business center, a fitness room, and guest laundry facilities.

### B.   Debtor's Loan Obligation.

7.   A Term Loan Agreement was entered into between Debtor and Wachovia effective February 28, 2008, pursuant to which Wachovia agreed to lend Debtor the principal amount of $14 Million (the "Loan"). A true and correct copy of the Term Loan Agreement is attached as **Exhibit "2."**

8.   Debtor executed the Promissory Note in favor of Wachovia, in the principal sum of $14 Million. A true and correct copy of the Promissory Note is attached as **Exhibit "3."**

. . .

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102507-003/1263103.doc

2

9. As security for the repayment of the Promissory Note, Debtor and Wachovia entered into the Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing the "Deed of Trust"), a true and correct copy of which is attached as **Exhibit "4."**

10. Debtor also granted Wachovia: (i) an Assignment of Permits, Licenses and Approvals;[2] (ii) a Deposit Account Control Agreement (the "DACA") for funds held in account number 85009768 at Silver State Bank, which account was closed pre-petition; (iii) an assignment of its Premier Hotel Corporation Management Agreement, which agreement was terminated pre-petition; and (iv) a pledge of and security interest in a working capital account under the control of Debtor's former management company, which account was also closed pre-petition.

11. On or about February 29, 2008, Wachovia additionally filed a UCC-1 Financing Statement with the Nevada Secretary of State.

12. As further security for the Loan, Ryanne Nigro, Michael Nigro, Margaret Nigro, and I (collectively, the "Guarantors") guaranteed the repayment of the Loan, the maximum liability of which was subsequently limited to $2.25 Million.

13. In or about April 2008, Debtor and Wachovia entered into a swap agreement, with an effective date of April 7, 2008 and a termination date of February 28, 2011. True and correct copies of the Master Agreement and Swap Transaction Confirmation are attached hereto as **Exhibits "6" and "7,"** respectively.

14. The swap agreement was terminated pre-petition.

15. On the February 28, 2011 Maturity Date, the outstanding obligation on the Promissory Note was approximately $14 Million (the "Secured Debt").

16. Although Debtor is not presently certain as to the exact value of the Property as of the Petition Date, as of July 12, 2010, the Property was appraised as having a going concern value as of July 12, 2010 of $12.2 Million and a prospective market value upon stabilization as of January 1, 2013 of $15.7 Million. As the Las Vegas hotel industry as a whole is experiencing

---

[2] A true and correct copy of the Assignment of Permits, Licenses and Approvals is attached hereto as **Exhibit "5."**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102507-003/1263103

3

marked improvement due to the beginning of the national economic recovery,[3] Debtor believes that the value of the Property as of the Petition Date has increased from its July 12, 2010 appraised value and may approximate or even exceed the Secured Debt as of the Petition Date.

### C. The Events Necessitating The Bankruptcy Filing.

17. For instance, despite having received all monthly payment obligations, on May 18, 2010, Wells issued to Debtor and the Guarantors notices of default premised solely on an alleged loan-to-value ratio covenant default. Specifically, Wells alleged that the value of the Property was $10.7 Million and therefore, purportedly in order to comply with the covenant requiring a loan-to-value ratio of less than 75.68%, demanded that Debtor immediately tender a payment of $5,902,240 in order to reduce the Loan balance to $8,097,760. Debtor was not able to satisfy the demand.

18. Able to fully service its monthly payment obligations under the Promissory Note and Debtor's belief that the Property was fully secured, prior to the Maturity Date, Debtor contacted Wells and sought to reach a consensual resolution with Wells to extend the term of the Loan; no principal reduction or interest rate relief was requested and the Guarantors all agreed to affirm their guarantees in the event of a maturity extension.

19. Despite months of negotiations and Debtor's ability to service its monthly debt obligations, a consensual resolution was not reached.

20. As a resolution could not be reached, on or about July 7, 2011, Secured Lender recorded its Notice of Trustee's Sale and advised Debtor that it would be filing a complaint and seeking the appointment of a receiver the following week, thereby leaving Debtor with no other option but to seek Chapter 11 relief despite its ability to service its monthly debt obligations under the Promissory Note.

. . .

. . .

---

[3] Publically available reports provided by the Las Vegas Convention and Visitors Authority state that: (i) city-wide hotel occupancy for January – May 2011 has increased 3.6% when compared with January - May 2010; and (ii) average daily room rates for January – May 2011 has increased 9.6% when compared with January - May 2010. See www.lvcva.com/getfile/37/ES-May2011.pdf.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102507-003/1263103

4

### D. Debtor's Current Financial Condition.

21. Debtor's revenue is derived primarily, but not solely, from its hotel room rentals. For the period of January through May 2011, Debtor's income exceeded its operating and fixed expenses by over $330,000, prior to payments to Secured Lender.

22. Further for the fiscal year ending December 31, 2011, Debtor anticipates that its revenue will exceed its operating and capital expenses by approximately $700,000, prior to the proposed adequate protection payments to Secured Lender of $177,000.

23. As set forth in the Budget, for the three (3) month period commencing on the Petition Date and concluding on September 30, 2011, Debtor's Budget anticipates a beginning cash balance of approximately $199,000, gross revenue for the period of July to September 2011 of approximately $521,000, and an ending cash balance as of September 30, 2011 of approximately $238,000. Thus, at all times, the Budget shows positive cash flow after payment of operating expenses.

### E. The Cash Collateral Motion.

24. On the Petition Date, Debtor had cash and cash equivalents located on the Property as of the Petition Date (the "Cash on Hand") and cash in its bank account as of the Petition Date (the "Deposit Accounts") in the approximate aggregate sum of $199,000. Such cash was not in the possession of or under the control of Secured Lender.

25. Debtor cannot meet its ongoing post-petition obligations unless it has the immediate ability to use Cash on Hand, the Deposit Accounts, and the cash generated or received by Debtor from and after the Petition Date (the "Post-Petition Cash"). In the absence of such use, immediate and irreparable harm will result to Debtor, its estate, and its creditors, and will render an effective and orderly reorganization of Debtor's business impossible.

26. An integral aspect of maintaining Debtor's business operations is Debtor's ability to use Cash on Hand, the Deposit Accounts, and Post-Petition Cash to maintain a sufficient level of working capital in order to pay ordinary course obligations such as those to its employees, vendors, utilities, taxing authorities, insurance, and to pay for necessary ordinary course property maintenance and projects.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102507-003/1263103

5

27. Each expense included within the Budget is a necessary expense to maintain, preserve, and/or operate the Property, which is the sole means of generating revenue, thereby increasing the value of the Property and providing the resources for Debtor to reorganize

28. Debtor believes that the value of the Collateral is more than $12.2 and may approximate, or even exceed, the Secured Debt as of the Petition Date. Regardless of the precise value, Debtor believes that given all of the circumstances regarding the Collateral, the Collateral will not diminish in value and, as set forth in the Budget, will increase in value.

F. **The Utility Motion.**

29. In the ordinary course of its business, Debtor incurs utility expenses for cablevision, electricity, gas, internet/wireless and telephone service, water/sewer, and waste management. These utility services are provided by the utilities (as such term is used in Section 366, collectively, the "Utility Providers") including, but not limited to those listed on **Exhibit "2"** to the Utility Motion (the "Utility Service List").

30. On average, Debtor spends approximately $16,810.07 each month on utility costs. As of the Petition Date, Debtor believes it is substantially current on utility payments as set forth in the Utility Service List that came due on or before the Petition Date.

31. Preserving utility services on an uninterrupted basis is essential to Debtor's ongoing operations and, therefore, to the success of its reorganization. Any interruption of utility services, even for a brief period of time, would disrupt Debtor's ability to continue servicing its customers, thereby negatively impacting customer relationships, revenues, and profits. Such a result could jeopardize Debtor's reorganizations efforts and, ultimately, Debtor's value and creditor recoveries. It is therefore critical that utility services continue uninterrupted during this Chapter 11 Case.

32. Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner. Debtor expects that it will have ample liquidity, based upon cash on hand and cash flow from operations, to pay its post-petition obligations to its Utility Providers. Specifically, Debtor's operations are currently cash flow positive prior to debt service, and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102507-003/1263103

6

Debtor presently has approximately $199,000 either in Cash on Hand or in its bank accounts as of the Petition Date.

33. To provide additional assurance of payment for future services to the Utility Providers, Debtor has allocated the collective sum of $16,850.00 (representing more than one month's average utility expense) to be made available from Debtor's cash flow for the first two weeks for payment of utility deposits (the "Utility Deposit Reserve"). The Utility Deposit Reserve will provide still further assurance of future payment, over and above the Debtor's ability to pay for future utility services in the ordinary course of business based upon their existing cash on hand and cash flow from operations (together with the Utility Deposit Reserve, the "Proposed Adequate Assurance"). Debtor submits that the Proposed Adequate Assurance provides protection well in excess of that required to grant sufficient adequate assurance to the Utility Providers.

34. The proposed Procedures are necessary for Debtor to carry out its reorganization efforts. If they are not approved, Debtor could be forced to address a host of requests by its Utility Providers in a disorganized manner during the critical first weeks of its reorganization. Moreover, Debtor could be blindsided by a Utility Provider unilaterally deciding--on or after the thirtieth day following the Petition Date--that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service, particularly electricity, could essentially shut down operations, and any significant disruption of operations could put the Debtor's reorganization efforts in jeopardy.

### G. The Deposit Motion.

35. As of the Petition Date, certain customers had placed deposits for future use of hotel rooms.

36. Maintaining the satisfaction and goodwill of prospective guests is imperative to the success of any reorganization by Debtor. If Debtor is unable to honor advance deposits for hotel room reservations, its operations will be severely affected and Debtor will likely be unable to escape the immediate and irreparable harm that will follow.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102507-003/1263103

7

37. As of the Petition Date, Debtor estimates that it is holding Customer Deposits of approximately $2,154.71.

38. Debtor has sufficient cash on hand and in its bank accounts to honor all of the foregoing Tenant Deposits.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED this 13th day of July, 2011.



TODD NIGRO

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102507-003/1263103

8